IN THE UNITED STATES
DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON, TEXAS DIVISION

United States Courts
Southern District of Texas
F I L E D

SEP 3 0 2021

Nathan Ochsner, Clerk of Court

TAMEIKA PRICE                                    Jury Trial Demanded

Plaintiffs,

VS.

GREYSTAR WORLDWIDE, LLC

Defendants,

---

# **Complaint and Statement of facts**

1. Ms. Price was a Temporary Hire on Probation from May 2018 to August 2018.

On May 28, 2018 Ms. Tameika Price, a black woman, was hired by Greystar Worldwide, LLC (hereinafter "Greystar") as an assistant manager at Wilshire Park Apartments. She was referred to this position by a property manager at another Greystar property, Ms. Karah Carillo. Ms. Carillo told Ms. Price that a colleague of

hers, Mr. William Lewis Green (hereinafter "Mr. Green"), was looking to hire an assistant manager on a permanent basis with the rate of pay at $18 per hour. Ms. Price demonstrated interest in the position relying on the pay rate mentioned since she knew Ms. Carillo, a property manager herself as well as a close friend of Mr. Green, would have the accurate details of the job. Additionally, Ms. Carillo represented herself as having the authority to provide this information, which is why Ms. Price relied on it. Ms. Price showed interest in the position and was then given Mr. Green's number to set up an interview. Following the conversation with Mr. Green, Ms. Price advised her agent, Ms. Krista Holt, to place Ms. Price on payroll for only 30 days. However, Ms. Price's probationary period lasted from May 28, 2018 to August 6th, 2018, substantially more than 30 days. Following the end of her probationary period, Ms. Price was interviewed again for the same job. Greystar was thoroughly impressed with her work leading to an offer for a full-time, non-exempt position with a rate of pay based on $16.35 per hour following the end of her probationary period with a tentative start date of August 3, 2018, as evidenced by her offer letter. Ms. Price was confused as this was significantly less than the rate of pay initially promised by Ms. Carillo especially after accepting the offer to discover that it was a dual position of Assistant Manager and permanent duties of a leasing consultant.

2. Ms. Price soon noticed that while she was being denied a pay increase and incentives, Ms. Jennifer Krohn, the regional district manager, had approved a sixty ($60.00) phone allowance for Mr. Green (which was more than the $50.00 maximum amount allowed for managers) and a $50 phone allowance for another male employee, Victor Bernal, after denying Ms. Price. Phone allowances were given to employees who responded to resident concerns after hours. Even though Ms. Price was a point of contact for the after-hours staff and performed those tasks personally on multiple occasions, she was never given a phone allowance. Therefore, Ms. Price was not paid justly, given incentives, nor provided a phone allowance even though she continued to assist temp agents on her off days by opening and closing the doors for business and answering work related phone calls and text messages after hours which directly related to assisting Mr. Green and resident concerns. Additionally, as shown in the exhibit, maintenance staff had to give temp agents access to the office on the weekends, proving that they were not just given overtime for maintenance requests but other tasks as well. From the time Ms. Price was employed with Greystar they maligned her as a black woman, failed to provide bonuses, failed to give her equal workplace opportunities, commissions, and habitable living arrangements, overworked her without pay unlike her non-Black and male counterparts, and constantly harassed her and dismissed her authority.

**Ms. Price was Offered Uninhabitable Living Conditions, and Her Repair Requests were Constantly Delayed**

3. Upon starting her employment with Greystar, Ms. Price also lived on the Wilshire property. Greystar had a "make-ready" policy which guaranteed that all apartments should be ready by the time the tenants moved in. However, the apartment that Ms. Price selected was not habitable to say the least. She chose it with the "make-ready" policy in mind, as she was confident that Greystar would abide by their policies and make the apartment available to her only after it was habitable, but that was certainly not the case. The ceilings were cracked excessively, mold and mildew were coming from the air ducts and vents in the wall, the safety latches were defective, the countertops were dirty, and there were rat feces on the dryer and washer intended for her apartment but left outside for her to move in manually. In addition, the security devices like the front-door locks were unchanged from the ones installed for the previous tenants who were now only a few apartments down from Ms. Price and therefore still retained access to her apartment. Greystar treated Ms. Price as if she was inferior and didn't deserve the upkeep. Ms. Price documented all these atrocities for keepsake. In fact, she had given her prior landlord a 60-day notice as to when she would vacate the apartment, and that date was never changed. Moreover, Ms. Price was never told that the apartment would not be ready in time. Therefore, she had no reason to suspect that the apartment would be in such a condition.

4. Instead of providing a "make-ready" apartment, Greystar told Ms. Price that she should follow the non-standard process and send in work orders with the maintenance staff to repair anything that still needed attention. Therefore Ms. Price sent in numerous requests for all the issues in October of 2018, but they were not addressed. It wasn't until March 4, 2019, 7 months later, that only her air ducts that was filled with mold were cleaned which resulted in Ms Price calling 911 due to breathing issues and later also having to seek medical attention.  Greystar alleges that Ms. Krohn, the regional property manager at the time, upgraded the flooring in Ms. Price's selected apartment to wood floors and therefore is confused about how Ms. Price can be unsatisfied with the unit when she received wood flooring. However, any reasonable tenant would prefer to have a habitable apartment rather than wood floors. Wood flooring is a luxury but mold-free air vents, reliable ceilings, secure safety devices, and cleanliness are necessities which are needed to stay alive and feel safe and can affect pursuit of happiness.  Wood flooring brings no solace when the tenant is afraid to sleep at night because of defective security devices. This would explain Ms. Price's dissatisfaction with her apartment. Additionally, When Ms. Price inquired about her living space, Mr. Green, a white male, humiliated her in front of the all-male maintenance staff by telling her she could make her "dining room a closet by using a bedsheet". This extremely disrespectful and unprofessional comment left Ms. Price feeling ridiculed and embarrassed and she subsequently

complained to her supervisor Ms. Krohn about the incident on September 12th. Ms. Price would soon realize that this was just the beginning of the disparate treatment that she faced in the office as the only Black and Female assistant manager.

**Ms. Price Never Received her Compensation for Overtime Work Hours and her Time logs were Frequently Edited.**

5. Ms. Price regularly worked over-time and was not justly compensated as compared to her male counterparts. Ms. Price brought this matter to the attention of Mr. Green, the community property manager, as well as Ms. Sharise Linson, the regional property manager at the time, via text message and email respectively specifically complaining about discrimination, in 2019 to no avail. Furthermore, upon receiving the emails from Ms. Price, Ms. Linson told Ms. Price that she (Ms. Linson) would make a telephone call to Ms. Price regarding the issue. When Ms. Linson did call, per Ms. Price phone records, they proceeded to speak on the phone for two hours with Ms. Price explaining all her complaints in detail and how she was getting derived from an equal opportunity workplace, sex discrimination, sexual harassment and violations of the fair labor act. Therefore, both supervisors were made aware of the issues that Ms. Price faced but failed to take any action to remedy the situation. Upon reading the complaints by Ms. Price, Mr. Green would always

claim that Greystar did not have the budget to pay overtime, but Mr. Green was fully aware of Ms. Price working countless hours overtime, but he never informed her that she needed approval beforehand. Therefore, he allowed her to work overtime, and would leave her voicemails encouraging her to take a day off in lieu of getting paid for those hours , which was specifically against the Greystar timekeeping policy.

6.  Ms. Price worked several office events and conducted work-related interactions with residents after 8 pm for which she never received overtime compensation because Mr. Green would always clock her out much earlier than 8 pm. On another occasion, Mr. Green attempted to cut personal hours on Ms. Price's paystub and refused to pay Ms. Price's preapproved paid vacation time, in an effort to prevent her from getting her overtime pay. However, Ms. Price noticed and complained to Ms. Linson which resulted in Mr. Green contacting the Payroll coordinator to send over an additional paycheck containing the pay for the cut hours. Not only would Mr. Green direct Ms. Price to take a day off in lieu of getting overtime, he justified it by stating that he, an exempt employee, also did not receive overtime. Additionally, Ms. Price overheard Mr. Green promising overtime compensation to one of the ground porters for the same task that Ms. Price would do on her off days with absolutely no overtime compensation. This is when Ms. Price realized that her male counterparts were receiving overtime, while she, the only Black female in the

office was not. The only time Mr. Green would give Ms. Price overtime was when she covered Mr. Green's extra days off.

7. Mr. Green as well as the other managers had the ability to make edits on employees' time logs but were required to submit a manual timesheet including the respective employee's signature to show that the employee authorized and agreed with the adjusted time since the edits were shown done by the employee. However, Mr. Green took advantage of this situation by never completing the required manual timesheets to essentially keep Ms. Price from receiving overtime. On many occasions, Ms. Price noticed that her clock-out time was changed to minimize the overtime hours she worked. On one specific occasion, Ms. Price was still at work when she noticed that she had already been clocked out an hour before. She then proceeded to notify Ms. Linson who altered the mistake. On many other occasions as shown in the exhibit, Ms. Price's working hours were tampered with. Specifically, on September 11, 2018, Ms. Price was clocked out at 6:08 pm when in fact she was in the office until 7:43 pm, as evidenced by a work email sent to a supervisor at that time. After these incidents, Ms. Price realized that supervisors were allowed access to individual time logs to clock in/out employees and that she was regularly getting clocked out without her knowledge. This was especially concerning because Ms. Price did not have the authority or access to do any time edits from her account. If there were any edits done, they would only be done by management, but they would

appear as if they were done by the employee. Mr. Green would tell Ms. Price frequently to not clock-in or clock-out, and then he would go into the system to alter her time prior to the required due date to submit time, keeping Ms. Price's total hours at a maximum of 8 per day without indicating a clock-in or clock-out time, even though she regularly worked more. This was done in order to specifically keep Ms. Price from receiving overtime. Although Greystar required a manual timesheet to be submitted whenever time was altered, Mr. Green never followed the protocol for Ms. Price but did for the other non-black male employees . On the rare occasion that Mr. Green filled out a manual timesheet, he would never obtain Ms. Price's required signature. Each manual time sheet required the employee's signature; however, Mr. Green would fill them out without Ms. Price's authorization or signature. Again, Ms. Price experienced racial and sex discrimination when she noticed that her manual timesheets were never authorized by her, but the manual timesheets of her male counterparts always had their respective signatures on them. This was just another way in which Ms. Price was discriminated against due to her race and gender.

**Ms. Price Seldom Received her Qualifying Delinquency Payments Even Though She Inquired about Incessantly.**

8. A delinquency bonus is given only to Assistant Mangers as stated on the Greystar bonus template and it is labeled as a Monthly Property Bonus or rather as code 'MTHOTHPRBONUS" on the employee's earnings statement and the timekeeping coding policy.

**9.** Ms. Price as the Assistant Manager would be the only qualified individual to receive this type of bonus because a community manager like Mr. Green does not receive a monthly property bonus rather only receives a quarterly bonus if eligible. Ms. Price, as the assistant manager, had to collect over a specific stated amount of rent each month in order to qualify for this monthly property bonus. As evidenced on her reconciliation summary for several months in 2018, 2019, and 2020. Ms. Price's actual amount collected was consistently in excess of her amount required to be collected in order to qualify for the delinquency bonus. However, she only received a delinquency bonus twice even though she qualified monthly for the said bonus, which was actually being given to Mr. Green. Therefore, Ms. Price didn't receive her qualified bonus and commission on September, October, November and December of 2018 and January through December of 2019.

10. Ms. Price inquired about the bonus many times via email to Ms. Sharise Linson, the Regional Property Manager at the time, and via text message to Mr. Green. Ms. Linson's response consisted of her sending out a bonus template to the team in a general email and reminding everyone to use it properly, with no direct reply to Ms.

Price. Ms. Price qualified for the bonuses since her percentage was normally 2-3% as stated by Mr. Green.  Also, after receiving the template from Ms. Linson, she then noticed that she wasn't receiving 90% of pay due to the bonus structure. Mr. Green, who regularly told Ms. Price that the company didn't have the budget to give out property bonuses did assure her via text that she did reach the required percentage to obtain the property bonus and qualified for the bonus except that again, the company did not have the budget to give her one. However, when Mr. Green casually left his and a male coworker, Victor Bernal's paycheck on the printer, Ms. Price noticed that Mr. Green was in fact receiving a monthly property bonus while the male employee was receiving a quarterly bonus, both bonuses that Ms. Price qualified for as indicated by the Greystar bonus template, but never received allegedly due to the budget. When Ms. Price noticed that the bonus Mr. Green received accompanied a code that corresponded to the monthly property bonus, she realized that Mr. Green had been consistently receiving her monthly property bonus, a bonus that a community manager like Mr. Green didn't qualify for. Mr. Green had also been paying her male counterparts their quarterly bonuses, a bonus that Ms. Price also qualified for and never received, while lying to her about Greystar's budget not affording them. Ms. Price only received one 'Monthly Property Bonus' on December 20, 2019 throughout her entire time at Greystar despite being qualified

every month, once again, deriving her from having an equal opportunity workplace and pursuit of happiness.

**Mr. Green Regularly Stole Ms. Price's Commission While doing Significantly Less Work.**

11. Mr. Green was consistently either late to work or absent completely. When he was there, he would sleep at his desk.  Moreover, he did not know how to do leases which left all the lease work completely to Ms. Price.

12. Thereby saying that Mr. Green should have had the knowledge of how to do leases since it was part of his job. Especially since he had worked at Greystar for thirteen years. However, Mr. Green did not know how to do any leases. Therefore, all the leases were mainly done by Ms. Price.

13. Ms. Price soon realized though that although she was conducting all the leases, Mr. Green was stealing her bonuses for the said leases. Every apartment lease contract that was completed would contain the leasing agent's name who did the lease and would receive the bonus. Then, Mr. Green would complete an employee commission checklist which would contain the lease information, the agent's name and the manager's signature. In one such incident, Ms. Price conducted the lease and prepared the documents for Killebrew, a tenant. She signed her signature on the bottom of the apartment lease contract as per usual being the agent who conducted

the transaction which also matches the One-site Move in report, a report that collects the leasing agent data combined with all performed tasks and qualified commissions. However, when Mr. Green filled out the employee commission checklist for the Killebrew commission, he signed his name under leasing agent as well as under manager approval. Therefore, Mr. Green stole Ms. Price's expected leasing bonus for the Killebrew tenant. When Ms. Price found out she brought it to the attention of the regional property manager at the time, who fixed the situation and directed Mr. Green to deposit the commission to Ms. Price. At this point, Ms. Price realized that if she had not seen Mr. Green's paystub, she wouldn't have ever known that he was stealing her bonuses. In fact, she was then certain that prior to this occasion, Mr. Green had indeed been stealing her bonuses and commissions while the regional property managers were regularly approving his actions without the required prerequisite documentation that would identify additional commissions matched with the designated qualified employee to receive the commissions. Ms. Price also realized that Mr. Green never completed the required bonus template and required documentation so he could steal her bonuses and leasing commissions.

**Ms. Price's Personal Work Computer was Not an All-Access Computer.**

14. After Ms. Price complained about the stolen bonuses, she noticed Mr. Green's increased retaliatory acts towards her. Mr. Green became frustrated at minor incidences in order to retaliate against Ms. Price. This is when Mr. Green tried to get access to Ms. Price's personal work computer and became infuriated when Ms. Price would not provide access. Her computer had a specific username and password, that which only she had knowledge of. The staff knew of the Greystar workplace policy, which was to secure your workplace station, thereby meaning computer passwords were not to be shared whatsoever. If that were not the case, the computers would not have personal usernames and passwords. It would indeed be all access, and whoever sat on the computer would be able to access it without the need for the username and password. Furthermore, Ms. Price, as the assistant manager, had a vast amount of confidential information on her computer including tenant pay stubs, correspondence, monthly reporting and rent. This information was contained on ONESITE as well as her general computer data, therefore, the computer was to be viewed only by the assistant manager, not by the maintenance staff, because the confidentiality of the data made it inaccessible to the staff. The staff at the property had their own personal work computer which had the basic capabilities of printing work orders and allowing log ins. The maintenance staff's computers as well as Mr. Green's computer also contained a username and password that no one else had

knowledge of. No one went on any other employee's computer, except for Ms. Price's computer.

15. However, Mr. Green and staff would always request Ms. Price's password In actuality, the real reason as to why maintenance staff wanted to access Ms. Price's work computer was to show that the office was open on the days that Ms. Price was off and Mr. Green was not in the office or running late, as usual. Mr. Green would instruct maintenance staff to open the office, log on to Ms. Price's computer, and manage the office until Mr. Green decided to show up for the day. Mr. Green was constantly late and even when in the office, he would be sleeping. Ms. Price did complain to Ms. McAuley about these instances to which Ms. McAuley inquired as to whether Mr. Green had a sleeping condition.

**Ms. Price Faced Constant Harassment During Her Time at Wilshire. Tex. Lab. Code § 21.142**

16. Throughout her time at Greystar, Ms. Price's immediate supervisor was Mr. Green, the Community Manager. Mr. Green was very unprofessional towards Ms. Price on numerous occasions. The text messages were retained to show that Mr. Green would send Ms. Price messages on a regular basis, irrespective of time, requesting her to call him after hours using service and work-related requests as an

excuse, frequently as late as 10 pm which Ms. Price always found unsuitable. Sometimes his messages were extremely casual with a sole purpose to initiate a conversation with Ms. Price unrelated to work. Mr. Green would send her text messages on her off days inquiring about non-emergency work information that could easily be obtained from other co-workers or files in the workroom. In one instance, she submitted a doctor's note disclosing all the details of her absence. Mr. Green still sent her a text message inquiring about her return date. Mr. Green would harass Ms. Price by calling her 'sweetie', 'honey' and 'sexy' in multiple instances.

Additionally, his messages would always contain emoticons that are considered extremely inappropriate amongst co-workers.

17. Lastly, Mr. Green sent Ms. Price unsolicited personal pictures. Ms. Price would try to disregard these comments, messages, pictures, and informalities in order to keep the focus on her work and not add to her problems, but the comments stayed persistent and weighed heavily on her. It's unacceptable that Greystar handles such sensitive matters like workplace harassment by a casual slap-on-the-wrist and mild admonitions.

18. Ms. Price was verbally accosted by Mr. Green in front of the entire all-male staff on October 23, 2018 for leaving a lockbox open when she wasn't the one responsible. The staff already undermined Ms. Price's authority as the only Black

and female assistant manager, but this incident belittled her further. Mr. Green felt that he could get away with speaking to Ms. Price disrespectfully because not only was she the only woman, but also the only Black woman in the office. Ms. Jennifer Krohn, another supervisor, was there to witness this particular incident. Since Ms. Krohn personally witnessed the humiliation, she addressed the matter by directing Mr. Green to apologize. However, this was not an isolated event as Mr. Green had a habit of verbally and publicly harassing and humiliating Ms. Price and then following up with a private apology. Mr. Green would always accompany his apology with the reasoning that his frustration was due to his unfamiliarity with his job. Ms. Price would ask maintenance to pick up trash as part of their daily expected duties, but they would refuse Ms. Price's commands and disregard her authority as a manager due to her being the only woman in the office. Albeit they would always follow Mr. Green's orders. There were incidents of big articles of furniture sitting by the dumpster for days despite Ms. Price requesting maintenance staff numerous times to pick it up as well as instances of complete refusal by staff to follow Ms. Price's orders Ms. Price had to eventually report the maintenance staff to her higher ups. Only when the maintenance staff was threatened with disciplinary actions for not following Ms. Price's orders, did they remove the trash on the premises that was witnessed by the property residents. Therefore, even Ms. Price sending in service requests to the maintenance staff was intolerable and she was left no option but to

continue living in filth and unhealth conditions. The fact was the maintenance staff refused to follow Ms. Price's orders because she was a woman and a woman of color.

**Ms. Price Made Numerous Transfer Requests that were Ignored and was Eventually Terminated as an Act of Retaliation.**

19. Frustrated with the conditions of her work, starting May 31, 2019, Ms. Price decided to request a transfer out of Wilshire, after reporting discrimination multiple times to Ms. Linson via phone.

20. Following her requests, she was always reassured by the managers that they would personally handle the issue. Ms. Price approached Ms. Linson, the regional manager at the time, about a transfer in May 2019 and in turn Ms. Linson assured her she would look into the matter. In June 2019, Ms. Price attempted to follow up with Ms. Linson, only to get no response. In February of 2020, after Ms. Price retained legal counsel, she spoke to Ms. McAuley, the regional manager, about the transfer in person, yet again. Ms. McAuley's reply was to instead encourage Ms. Price to resign and look for other employment opportunities. Ms. Price then sent Ms. McAuley a follow up email reassuring her about her intention to stay with Greystar. Ms. McAuley then told Ms. Price to find transfer locations through the listings and to do a physical interview. Interestingly enough, Ms. Price would find positions on

the listings, inquire about them, interview with them, but then never hear back once she notified Ms. McAuley about the interviews.

21. This process took a considerable amount of time, after which Ms. Price decided to just apply through the online portal rather than through the methods explained to her by management. She then applied to five different positions that she found suitable. She received confirmation of these applications via email in which she was told that her applications were processed, and her transfer request needed to be initially approved by her current manager. This was never done, however. Ms. Price applications stayed in a pending upon manager approval. It was clearly at the discretion of her supervisors whether she would receive the transfer because they never approved the transfer.

22. Ms. Price was the only employee who had been consistently dealing with harassment and discrimination for a considerable amount of time. Her prior transfer requests that management was still delaying were the main reason why she, unlike the other employees, had more difficulty with getting through the process. No other employee had been waiting on a transfer approval in her circumstances, no other employee had in-person conversations with management reassuring them that their requests would be taken care of. Her transfer requests were made prior to the notice of change of management and was ignored. During the time that everyone was being informed about applying online, Ms. Price was still being personally assured by

management that her transfer would be taken care of. However, management would not take care of the issue. Rather, they instead delayed the issue as long as possible to force a termination on Ms. Price. Ms. Price was left without employment, increased rent because her rent concession was terminated and a secure place to live because Greystar failed to negotiate her living arrangements per Greystar living arrangement contract for employees, which was a Tortious Interference with Contract between Greystar and Ms. Price. Greystar alleges that Ms. Price wasn't terminated, but Ms. Price suffered all consequences of termination.

23.   Eventually, Ms. Price was informed of Wilshire's change of management and she was given two options. Either she could stay with Greystar and apply within the system to another property, albeit with a chance of a demotion and lesser pay. Or, she could continue employment with the new management on the same property with the same staff and community manager with terms already negotiated by the companies on behalf of Ms. Price. Both options were highly unfavorable for Ms. Price. Of course, she preferred to stay with Greystar, but a demotion and pay reduction was not something she could afford. Staying on the property with the same management and maintenance staff, however, would be worse. She had been attempting to leave these circumstances for much too long, hence, the transfer requests.

24. Finally, in retaliation of her complaints about race and sex discrimination, Ms. Price was placed on an administrative leave by Greystar. When Ms. Price complained about Mr. Green stealing bonuses and commissions from her, Greystar retaliated by placing her on an administrative leave which is evidenced by her termination paycheck which clearly states, 'Admin leave'. Therefore, Greystar retaliated on Ms. Price's complaint by sending her on an administration leave, also known as, terminating her. Greystar attempts to mislead this fact by alleging that Ms. Price was not forced to resign, nor was she ever sent on any leave, rather she just lost her employment by 'loss of management'. Loss of management was never the case because Ms. Price was an employer of Greystar and not a subsidiary of the contract between Greystar and the owner of the property. There were no indications in Ms. Price employee contract that her employment continuance would be based off the relationship between Greystar relationship/ contract with the property. However, the evidence of her final paycheck outlines that after complaints of harassment, Greystar retaliated and ultimately terminated Ms. Price.

**Greystar exhibiting more racial and sex discrimination.**

25. At the end of the day, this is not the first time that Greystar has exhibited discriminatory behavior towards African Americans in general, and particularly African American women. Just last year, Michelle Pawalek, the Senior Director of Real Estate in Operations for Greystar sent an email out to all of Greystar Houston's Property managers, Regional Property Managers, and Property Management Directors titled "Fraudulent leaseholders aka Trap Queens". The content in the email offered tips on how to familiarize yourself with a "Trap queen" by using a reference to a song written by the famous African American rapper "Fetty Wap". The music video of the song visualizes all African American women as "trap queens". Greystar leadership presumed that it was a good idea to send out racially discriminatory material and, on that basis, still finds it appropriate to discriminate against African American women by treating them inferior and retaliating against them when they make protected complaints. In fact, Greystar was also in the news for retaliating against a female employee by terminating her once she complained about harassment based on sex and her pregnancy. After this incident, an EEOC representative from Phoenix stated that "Employers must refrain from taking adverse action against an employee who engages in protect activity" and that "The EEOC will continue to vigorously defend the federally protected rights of victims who are penalized when they exercise their rights under the law. Therefore, we see that Greystar has established a pattern of discriminating and retaliating against African

American and female employees and that's why Ms. Price experienced the same fate during her employment with Greystar.

# LEGAL FRAMEWORK

**Ms. Price can establish a claim for retaliation under Title VII.**

26. Ms. Price was retaliated against for complaining about harassment, discrimination, commission theft in the workplace, unpaid bonuses and overtime pay, delayed requests for apartment repairs, and repeated transfer requests and complaints that went unacknowledged.

27. A "claim of unlawful retaliation under either Title VII/PDA or the ADA requires an employee to make a prima facie case by showing that: (1) she engaged in an activity protected by the applicable statute; (2) she suffered an adverse employment action and (3) there is a causal connection between the protected act and the adverse action." Aryain v. Wal-Mart Stores Texas LP, 534 F. 3d 473, 481 (5th Cir. 2008).

28. When Ms. Price made multiple complaints to her managers about lack of overtime pay, altered timesheets, living conditions, and general staff hostility, these complaints were considered protected activity. Her multiple complaints were not appreciated by management who in turn retaliated by putting her on administrative leave. Therefore, Ms. Price's complaints about the discrimination that she endured as a black woman led to retaliation in the form of her termination. The record shows, Ms. Price had been requesting a transfer for quite some time, especially following her complaints about harassment. Furthermore, Ms. Price was given administrative leave after her last complaint about Mr. Green yet again stealing her commission. Ms. Price's last earnings statement shows her payment consisting of 'admin leave'. Therefore, there is no argument here that Ms. Price voluntarily left Greystar when Greystar itself put her on administrative leave and essentially terminated her due to retaliation after Ms. Price's complaints.

29. Additionally, Greystar made allegations that Ms. Price was not terminated intentionally but rather terminated due to loss of management. But Ms. Price was given two options when the property was going to have a change in management. Ms. Price could resign and take a position with First Choice Regional, the new management company, but remain under Mr. Green's supervision or try to transfer again for a 4th time and secure an internal offer by the date Greystar have a loss of

management of the property and the new company took over, her employment would

end as a result of "loss of management".

30. Greystar is tiptoeing around the clear indication that they terminated Ms. Price's

employment with them by eliminating all possible avenues for her. Firstly, both her

options were not viable. Secondly, it was Greystar's responsibility to transfer her

from the property. As to the first, between the two options given to her, none of them

were real solutions to her problems. She liked Greystar and she wanted to continue

working for them, however the possibility of demotion and lower pay would not be

feasible. In Aryain, the court found for the employer in a retaliation claim where

plaintiff was transferred due to sexual harassment in the workplace, she was

transferred to an area where her rate of pay was maintained. This is not the case here

because in order to keep her job, Ms. Price had to specifically accept a lower pay

rate and position. The court would agree that this treads on retaliation because it

highly discourages employee from selecting that option.

31. If Ms. Price stayed at the property with the new management company, this

would not solve any of her problems because she would still be working with the

same supervisor and staff that she has made numerous complaints about. However,

Greystar knew that both options would disfavor her and leave her in a quandary long

enough to leave her unable to decide, and the new company would take over

resulting in her termination due to 'loss of management'.

32. Ms. Price's transfer should have been made by Greystar automatically and not by applying through a transfer system. She was an employee of Greystar for a long time and she had requested multiple transfers to no avail throughout her employment due to the hostile environment created by Greystar. Greystar violated Title VII by maintaining a hostile work environment based on race and sex. When an employee requests a transfer, an employer can accommodate that request without the employee having to interview for the other location, needing only a supervisor approval instead. A transfer is normally done without the formalities that Greystar took Ms. Price through after her complaint. It seems odd that Greystar never acknowledged that transfer request and instead has consistently blamed Ms. Price for not following the official procedure for requesting a transfer.

33. The fact Greystar completely disregarded the fact that multiple members of the management above Ms. Price assured her that they would personally handle the transfer request. The transfer requests were made long before Greystar's loss of management. Ms. Price was amidst that situation when Wilshire was to have a change of management. After stalling for a considerable amount of time, management relayed to Ms. Price that she should seek employment through the listings, which she did. However, after securing an interview with a job opening found on the listings and notifying a manager about the interview, Ms. Price never received a call back. It's astonishing how every time she notified management about

an opportunity, there was a roadblock created for her resulting in no further communication from the prospective transfer site.

34. After receiving no feedback from the listings interview, Ms. Price decided on her own to apply online through the Greystar portal. She applied for five separate positions within the Greystar system. She has kept record proof of these applications with acknowledgment of the receipt of her applications from Greystar who in turn informed her that her next steps will be relayed to her manager once the manager approves the request for transfer. Therefore, the transfer request was never approved by the managers at her Greystar location and the issue was with management not honoring her request rather than Ms. Price not applying correctly.

35. Additionally, it would only make sense that such a well-known company like Greystar would handle race and sex

discrimination issues more sensitively, rather than telling the employee to send a transfer request in the system and refraining to take any further action after if not

done correctly in the system. By their customer policies, you would think they would be more sensitive to discrimination and handle any issues efficiently.

36. In Aryain, the court decided that the employee was not compelled to resign because the poor treatment that she endured after her transfer like less break time allowed, waiting for long periods of time, and being left off the schedule did not rise to the level of a reasonable employee in her position feeling compelled to resign. Alternatively, Ms. Price was subjected to worse behavior by Greystar like no pay for overtime, horrible living conditions, constantly being targeted for mishaps done by others, altered working hours, commission theft, staff disregarding her authority, and her complaints and transfer requests not being taken seriously. Unlike Aryain, Ms. Price did complain, and she did feel compelled enough to request a transfer just as any reasonable employee would.

37. The record shows, Ms. Price had been requesting a transfer for quite some time, especially following her complaints about harassment and discrimination. It was always delayed and ultimately ended up in her being terminated, even though the termination was decorated as a resignation. Furthermore, Ms. Price was given administrative leave after her last complaint about Mr. Green yet again stealing her commission and the termination was not due to loss of management but rather due to retaliation after Ms. Price's complaints. For the above reasons, Ms. Price would succeed on her claim of retaliation.

38. Ms. Price was subjected to a hostile work environment under Greystar's employment. To prevail on a claim of a hostile work environment under Title VII, an employee initially must make a prima facie case of the following elements: (1) that the employee belongs to a protected class (2) that the employee was subject to unwelcome harassment; (3) that harassment was based on her membership in the protected class; (4) that the harassment affected a term, condition, or privilege of her employment, and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. This type of claim entails 'ongoing harassment, based on the plaintiff's protected characteristic, so sufficiently severe or pervasive that it has altered the conditions of employment and created an abusive working environment. Anderson v. Houston County. Coll Sys., 458 S.W.3d 633, 646 (Tex. App. –Houston [1st Dist.] 2015, no pet.) 42 U.S. Code § 1981 - Equal rights under the law

39. Ms. Price belonged to a protected class because she was black and her gender. She was subject to unwelcome harassment when she was given living accommodations that were below the "make ready" policy standards that the company has set for their apartments which ensures apartments are ready before moving in. Ms. Price's apartment was quite the opposite and it was essentially non-livable. Even after numerous requests to fix these problems, her requests were always delayed and taken care of after many months. Mrs. Krohn advised Ms. Price

to put in a work order to take care of anything that needed attention and therefore it was acceptable for the condition to be that way. Also going against Greystar Policy and fair housing laws on allowing the tenant to move in amidst health hazards and then send requests for the mold, mildew, and especially the safety device is negligence and a violation of landlord duties as well as their make-ready policy. This goes to show that the lack of care to have a make-ready apartment, the suggestion to make requests for essentials like proper security devices and habitable livable conditions without mold and mildew, the lengthy delay in the repairs, and the inability to acknowledge the issue is harassment and was done because Greystar didn't believe Ms. Price deserved a habitable apartment and also didn't think she would complain. In addition, Greystar created conditions that led to a stressful living atmosphere for Ms. Price which in turn affected her work.

40. Additionally, there was harassment at work against Ms. Price. Her constant requests for overtime pay were ignored. She was blatantly ignored when she ordered the maintenance staff to perform their duties. When she complained about it, the matter was delayed by management who referred to a meeting that should be held to address the matter which was of course never brought up again. The pattern here consists of Greystar constantly ignoring Ms. Price's concerns, issues, demands, requests, authority, and pay requests. Greystar never seriously considered Ms.

Price's complaints because of the color of her skin. Further, management had ample notice about all these complaints, and they failed to remedy any of them.

41. In Harris v. Forklift Systems, Inc., the court found for the employee even though there weren't direct discriminatory statements and actions. The court decided to distinguish from the accepted 'sufficiently severe or pervasive' standard and create a new standard focusing rather on the discriminatorily abusive work environment that seriously affects employees' psychological well-being and detracts from employee's job performance, discourages employees from remaining on the job, or keeps them from advancing in their careers. They said an environment can be considered "hostile" only by looking at the circumstances. These include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is of course relevant to determine whether the plaintiff actually found the environment abusive. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 [1993].

42. Ms. Price experienced discrimination at work that affected her psychological wellbeing enough for her to request her transfer from her job location and seek medical attention for anxiety attacks. When Ms. Price's would complain, Greystar considered these as accusations that reflected nothing but personality clashes and a

disagreement with the tone of voice used against her. Not only is this far from the truth, it also increases the harassment Ms. Price faced to trivial issues. Furthermore, a tone of voice is a factor that can be considered when looking at circumstances that create a hostile environment. Especially since many times discrimination doesn't occur outright, it is subtle and passing. This was recognized in the Harris case, which emphasized that the circumstances must be considered including conduct that is merely humiliating or an offensive utterance. The maintenance staff undermining Ms. Price's authority and not complying with her orders can be considered humiliating for her because as a manager her orders should be followed. Additionally, when Ms. Price inquired about her living space, Mr. Green and the maintenance staff responded that she could make her "dining room a closet by using a bed sheet". This is an example of an offensive utterance that could be considered humiliating especially when made by maintenance staff or in front of many people. Therefore, when we consider the tone of voice and passing subtle comments as factors, we can see that the circumstances were such that created a hostile environment for Ms. Price.

43. The harassment complained of was based on the protected characteristic of Ms. Price being a black female. Ms. Price noticed that the staff would disregard her orders and be uncomfortable with her authority but alternatively they would listen to Mr. Green who a white manager. Therefore, their resistance was due to the color

of her skin. Ms. Price noticed that only her requests were constantly ignored, regardless of whether they were for pay or for apartment problems. She realized that she was being targeted as a black female and this made the staff uncomfortable and therefore dismissive of her. Her requests and complaints were never taken seriously, and her timecards were always altered. Surely, this was done by management believing they would get away with it. Ms. Price endured conditions especially created for her as a black woman that made her work environment intolerable and the conditions affected her work. For the above reasons, Ms. Price would have a case for racial discrimination under hostile environment.

**Ms. Price can establish a claim for sex discrimination under Title VII and 42 U.S.C. § 2000e-2 and sexual harassment**

44. Ms. Price was subjected to sexual harassment under Greystar's employment. To prevail on a claim of sexual discrimination under Title VII and Section 1981, an employee must make a prima facie case of the following elements: (1) she is within the protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) she was replaced by someone outside of the protected class, or in the case of disparate treatment, other similarly situated employees were treated more favorable. See, e.g Okoye v. Univ. of Tex. Houston Health Sci. Ctr., 245 F.3d 507, 512-513 (5th Cir. 2001).

45. As a woman, Ms. Price is a member of a protected class. Ms. Price was certainly qualified for her position since she not only successfully executed the duties of her position as the assistant property manager but also performed tasks that were in the job description of the community manager, Mr. Green. Some of these tasks also included after hour work related interactions with residents. Additionally, Ms. Price was put on a probationary period for four months before she was offered a permanent position at Greystar. Surely, if she were not qualified, she would not have been offered the permanent position many months later. Ms. Price was subject to adverse employment actions when she had overtime compensation withheld from her, leasing bonuses and monthly property bonuses stolen from her, and commissions that she regularly earned that were kept from her. Additionally, the all-male-staff at the office regularly talked down to Ms. Price, disregarded her orders, disrespected her decisions, undermined her authority, and berated and yelled at her. Mr. Green even ridiculed her by suggesting the above mentioned 'bed sheet' comment. Other similarly situated employees, who were all men, were given overtime, provided bonuses and commission, that Ms. Price also worked and qualified for but didn't receive, and always treated with respect. Ms. Price complained to her higher ups about the discrimination that she faced in the office every day. On one occasion she even had to have the regional manager threaten her male staff in order to merely

follow her orders, which was even witnessed by the property residents. Thus, Ms. Price can clearly establish her prima facie case of sex discrimination.

**Burden-Shifting**

46. The case law is clear. "[A] plaintiff must first establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate the legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory." Lowe v. City of Monrovia, 775 F.2d 998 (9th Cir. 1985), amended, 784 F.2d 1407 (9th Cir. 1986).

47. Under the framework set out in Lowe, Greystar must provide a reason which is legitimate and nondiscriminatory for the adverse treatment of Ms. Price. If done, Ms. Price must show that the reason given is pretext for a prohibited reason.

48. Greystar can provide no legitimate nondiscriminatory reason for the race and gender discrimination against Ms. Price. Rather the court will have a hard time finding anything, but a classic case of employment discrimination based on race and gender. First, there is no justification for Ms. Price not receiving her bonuses, commissions, and overtime in comparison to her male counterparts. Secondly, Ms. Price complained of the discrimination, and Greystar was aware of the

discrimination prior to Greystar's change of property management. Ms. Price requested a transfer multiple times prior to the change of management, and Greystar refused to approve her transfer. Ultimately, Greystar terminated Ms. Price using the thin pretext of a change of property management. Greystar alleges that they have no record of complaints, previous transfer requests, which also violates 29 C.F.R. § 1602.14

## CONCLUSION

49. Ultimately, Ms. Price can sufficiently prove her claim of race discrimination, breach of contract, unequal workplace opportunities, sexual discrimination, sexual harassment, wrongful termination, retaliation, and several employment handbook contract violations against Greystar. Greystar condoned the malicious, willful, wanton, and reckless conduct alleged. These actions of negligence by Greystar affected Ms. Price life, liberty and her pursuit of happiness.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays the Court to:

1. Award Plaintiff punitive damages pursuant to 42 U.S.C. § 1981a et seq., and 42 U.S.C. § 1981 et seq.; 42 U.S.C. § 2000e-2; 29 C.F.R. § 1602.14; Tex. Lab. Code § 21.142;

2. Award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action;

3. Award Plaintiff punitive damages under Texas State law;

4. Award Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances; Ms. Price seeks compensatory, and exemplary damages for "past and future pecuniary losses resulting from the unlawful employment practices," as well as "past and future non-pecuniary losses resulting from the unlawful practices . . . including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses".

5.  Enter a judgment against Defendants and order the Defendants to pay Plaintiff of $200,001.00

6. If judgment cannot be entered against the Defendants, grant Plaintiff a trial of this matter by a jury.


This is the 30th day of September

Respectfully Submitted
Tameika Price
11816 Inwood Rd. #3079
Dallas, Texas 75244
Tel: 469-427-6064
Email: tameikapr@yahoo.com

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

TAMEIKA PRICE

**DEFENDANTS**

GREYSTAR WORLDWIDE, LLC

**(b)** County of Residence of First Listed Plaintiff    HARRIS
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    HARRIS
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                        *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane    [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability    Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel &    [ ] 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | Slander    Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability    Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine    [ ] 368 Asbestos Personal Injury Product | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 345 Marine Product Liability    Liability | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle    **PERSONAL PROPERTY** | | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability    [ ] 370 Other Fraud | **LABOR** | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal    [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | |
| [ ] 195 Contract Product Liability | Injury    [ ] 380 Other Personal | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice    Property Damage | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| |    [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights    **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting    [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [x] 442 Employment    [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations    [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment    [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other    **Other:** | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| |    [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education    [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| |    [ ] 555 Prison Condition | | | |
| |    [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of the Civil Rights Act of 1964;42 U.S.C. § 1981a et seq.42 U.S.C. § 1981 et seq.42 U.S.C. § 2000e-2;
Brief description of cause: *Sex Harassment*
Employment and Sex Discrimination;Civil Rights Violation, Breach of Contract &State Torts;29 C.F.R. § 1602.14

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
200,001.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____